IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| United Canvas & Sling, Inc. | ) Case No. 20-30781 |
| | ) |
| Debtor. | ) |
| In re: | ) Chapter 11 |
| | ) |
| Rounders Pit Foam, LLC | ) Case No. 20-30783 |
| | ) |
| Debtor. | ) |
| In re: | ) Chapter 11 |
| | ) |
| Schwartz Family Properties North Carolina, LLC | ) Case No. 20-30782 |
| | ) |
| Debtor. | ) |

**DECLARATION OF JOHN FIORETTI**
**IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, John Fioretti declares as follows:

**Introduction**

1. I am over the age of 18 and otherwise competent to make this affidavit. The facts set forth herein are true and are based on my personal knowledge, except those matters and things alleged upon information and belief, and as to those matters, I believe them to be true.

2. ABTV Receivership Services, LLC ("ABTVRS") is a wholly owned subsidiary of Anderson Bauman Tortellot Vos & Company ("ABTV"). I am a senior managing director of ABTV. ABTVRS is a firm focused on court-appointed roles including receiver, trustee, manager, chief restructuring officer and financial advisor.

3. In these roles, ABTVRS provides services for the purpose of preserving and maximizing the value of assets and operating companies. Similarly, ABTV is a firm focused on stabilizing and turning around troubled companies and providing related financial advisory services.

4. On the date hereof, United Canvas & Sling, Inc. ("UCS"), Rounders Pit Foam, LLC ("RPF"), and Schwartz Family Properties North Carolina LLC ("SFP," and together with UCS and RPF, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5. This Declaration is submitted in support of the first day motions filed by the Debtors (the "First Day Motions").

6. I have reviewed each of the First Day Motions, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to the Debtors, (b) to allow the Debtors to continue their businesses without interruption, and (c) maximize and preserve the value of the Debtors' chapter 11 estates.

**Historical Facts Regarding the Debtors and their Operations**

7. The United Canvas & Sling business was originally founded in 1967 by the Schwartz family as a New Jersey corporation. In 2007, UCS became a North Carolina corporation.

8. The company has an over 50-year history as the preeminent American manufacturer of athletic facility equipment. The company manufactures sporting and athletic equipment, primarily for track and field, speed and strength training, gymnastics and climbing.

9. The company has established a worldwide brand and reputation for its high quality, customized products that continue to be respected for their durability, longevity, and engineering centered around high performance and safety.

10. The company is well known for being awarded the exclusive contract to supply the track and field equipment for the 1984 Olympic Games in Los Angeles, as well as subsequent Olympics in Barcelona, Seoul, and Sydney.

11. The company moved it operations to North Carolina in approximately 2004. Debtor UCS is currently headquartered in Gaston County, North Carolina.

12. Debtor RPF is a small related family business that was formed in 2010. RPF makes pit foam for training gymnasts and action sports athletes.

13. Debtors UCS and RPF both operate from a manufacturing facility located in Lincolnton, North Carolina. The manufacturing facility is owned by Debtor SFP.

14. UCS currently employs 65 employees, many of which have been employed by the company for over ten years.

## Current Ownership Structure of the Debtors

15. The Debtors are affiliates through common ownership by the Schwartz family. Debtor UCS is a North Carolina corporation. Larry Schwartz owns 50% of the stock of UCS. The Estate of Jeffrey Schwartz owns 50% of the stock of UCS. Larry Schwartz and the late Jeffrey Schwartz were brothers.[1]

16. Debtor RPF is a North Carolina limited liability company. The Estate of Jeffrey Schwartz owns 50% of the membership interests in RPF. Larry Schwartz owns 25% of the membership interests in RPF. Jason Schwartz and Zachary Schwartz each own 12.5% of the membership interests in RPF. Jason Schwartz and Zachary Schwartz are Larry Schwartz's sons.

17. Debtor SFP is a North Carolina limited liability company. The Estate of Jeffrey Schwartz owns 50% of the membership interests in SFP. Larry Schwartz owns 37.5% of the membership interests in SFP. Jason Schwartz owns 12.5% of the membership interests in SFP.

## Dispute between the Debtors and Aquesta Bank

18. Prior to the petition date, Aquesta Bank (the "Bank") made four loans to the Debtors. The prebankruptcy debt structure is fairly complicated and intertwined because the prebankruptcy loan documents included, among other things, inter-affiliate guarantees, cross-default provisions, and cross-collateralization provisions.

---

[1] The company was originally founded by Jeffrey Schwartz and Lou and Margaret Schwartz (Jeffrey and Larry Schwartz's parents).

19. In pertinent part, the Bank made three (3) loans to UCS on February 27, 2018 and May 9, 2018, respectively, in the original aggregate principal amount of $1,445,000 (the "Operating Loans").

20. In connection with the Operating Loans, UCS executed commercial security agreements granting the Bank a lien on, among other things, inventory, equipment, and accounts.

21. The Operating Loans to UCS were guaranteed by, among others, debtor RPF. RPF is an affiliate of UCS through partial common ownership.

22. In addition, the Bank made a loan to SFP on May 9, 2018 in the original stated principal balance of $3,760,000.00 (the "SFP Loan"). Upon information and belief, the purpose of the SFP Loan was to refinance the existing indebtedness encumbering the manufacturing facility.

23. The SFP Loan was guaranteed by, among others, debtors RPF and UCS. RPF and UCS are affiliates of SFP through partial common ownership.

24. In May 2019, the Bank, the Debtors and the individual guarantors entered into a Modification Agreement regarding the foregoing loans that, among other things, contained cross-collateralization and cross-default provisions.

25. In addition, the Modification Agreement provided that SFP would guarantee the debts owed by UCS to the Bank.

26. The foregoing recitation is only intended as a summary of the loan documents and it is not intended as an admission about the validity, priority or extent of any lien asserted by the Bank. Nor is it intended as an admission about the amount of any debt owed by the Debtors to the Bank.

27. To that end, the undersigned has been informed by The Estate of Jeffrey Schwartz that it contests the authenticity and execution of one or more of the loan documents that were executed while Jeffrey Schwartz was ill. Jeffrey Schwartz died in July, 2019.

28. In addition, the undersigned is investigating with counsel whether and to what extent the inter-affiliate guarantees and pledges are avoidable as fraudulent transfers under state or federal law as to other creditors. Accordingly, the Debtors reserve the right to bring an appropriate action to challenge the validity, priority or extent of any lien or debt asserted by the Bank against the Debtors or their property.

### The Receivership Proceedings

29. On December 17, 2019, the Bank filed an action against the Debtors in Gaston County Superior Court seeking the appointment of ABTVRS as the receiver for the Debtors in the case captioned *Aquesta Bank v. Schwartz Family Properties North Carolina, LLC et al.*, Case No. 19-CVS-5137.

30. The same day, the Superior Court of Gaston County determined that ABTVRS was qualified to serve as receiver and entered the *Consent Order Appointing Receiver* ("Receivership Order"). *See*, **Exh. 1**.

31. When ABTVRS was appointed as the Receiver, we quickly discovered that UCS was in dire financial circumstances. A summary of the company's financial circumstances is set forth below:

   a. The receivership started with an overdraft book cash balance. Due to a severe lack of capital and constantly "returned" checks due to an overdraft cash position, UCS was on cash-in-advance or cash-on-delivery terms with most of its vendors;

   b. There were past due payroll taxes and sales taxes estimated at $800,000. Paychex, the company's payroll service provider, had stopped paying payroll-related taxes because of UCS's historical lack of funds;

   c. The 401k Plan was underfunded by over $200,000;

   d. Approximately 75% of the accounts payable were over 90 days old;

    e. The company's credibility with its customers was hurting because it was well behind on its orders and in some instances, making only partial shipments. Because of a lack of capital, it was unable to source needed inventory;

    f. Sales commissions and expense reimbursements were delinquent and payroll checks had bounced in the past, hurting employee morale;

    g. All insurance payments were severely past due, and policies were in danger of being cancelled;

    h. UCS had poor internal communications amongst management, production, and sales; and

    i. Monthly financial reporting was two months delinquent.

32. Based upon the foregoing financial circumstances, the Receiver took the following early steps to stabilize the business:

    a. Signatory control for all bank accounts and the ability to approve all wire transfers and ACH's were immediately transferred to the Receiver;

    b. Owner/insider salaries were significantly reduced by more than 50% (from over $1.25 million annually in the aggregate to $600,000 annually in the aggregate);

    c. $125,000.00 in new capital was contributed by ownership and was used to buy much needed inventory;

    d. A $300,000.00 loan was made by the Bank to 3070 State Highway, LLC ("3070") (an entity owned by the five children of Larry and Jeffrey Schwartz), and then a loan was made from 3070 to UCS which covered short-term cash needs;

    e. A 13-week cash flow projection was immediately generated (and updated several times since December 2019) and actual results are being tracked against projections on a weekly basis;

    f. Since the receivership started, UCS is paying all payroll taxes and 401k contributions on a weekly basis. Given the six month history of timely payments, the payroll service provider agreed to put UCS back on tax pay status as of June 2020;

    g. The Receiver had calls and meetings with several key vendors and negotiated payment plans for past due accounts payable. In many cases, we were successful in reinstituting credit terms;

    h. Monthly calls with the sales team have been reinstituted, in addition to implementing better communication channels between management and sales to respond to delivery date inquiries;

    i. Weekly production meetings have been reinstituted to prioritize open orders and better understand inventory needs to fulfill those orders. Communication between management and production has significantly improved;

    j. Payment plans with each of the insurance providers were negotiated to alleviate danger of the policies being cancelled;

    k. The accounting software has been upgraded, which will significantly enhance reporting going forward;

    l. With improved cash flow, UCS has been able to source more products directly, which reduced costs of goods sold.

33. In addition, UCS received a PPP loan in the amount of $895,000.00 in May 2020. The payroll loan proceeds were used to pay employees and other approved expenses. An application for 100% forgiveness was filed in August 2020.

34. The foregoing measures have stabilized the business and created a dramatic financial improvement to the operations of UCS. A few of those examples are set forth below:

      a. The company's adjusted EBITDA through June 30, 2020 was $1.03 million, significantly higher than the $783,000.00 budget forecast and substantially higher than the $3,000 adjusted EBITDA for the prior year's comparable six-month period;

      b. The company's operating income through June 30, 2020, was $487,000, significantly higher than the $236,000 budget forecast, and dramatically higher than the negative $206,000 for the comparable six-month period in 2019; and

      c. UCS has maintained 65 full-time employees in spite of the global coronavirus pandemic.

35. In short, and through the measures discussed above, the operations of debtor UCS have been stabilized and it is currently operating as a very profitable going concern in spite of the global coronavirus pandemic.

**Reasons for the Bankruptcy Filings**

36. After stabilizing the operations of the company, the Receiver was investigating various options for restructuring the company's debts for the benefit of stakeholders.

37. In pertinent part, it appeared that the following were the best options for a successful turnaround of the company: (a) pursuing: (i) a takeout loan from Crestmark Bank ("Crestmark"), and (ii) a sale and leaseback of the manufacturing facility owned by SFP, (b) a restructuring of the company's debts under the Bankruptcy Code, or (c) listing UCS for sale by Stout Capital, LLC ("Stout"), an investment banker.

38. To that end, in July 2020, the Receiver was negotiating a commercially reasonable agreement with Stout to sell the business.

39. In addition, the Receiver received a financing proposal from Crestmark in the amount of up to $2,750,000.00, subject to credit committee approval.

40. The Receiver also listed the SFP real property with a real estate broker and we immediately received offers exceeding $3,000,000.00. As of the date of this Declaration, we have received a full asking price offer of $3,650,000.

41. During the week of August 2, the Receiver made substantial progress towards finalizing the Stout brokerage agreement.

42. In addition, the undersigned was informed by Crestmark that the potential takeout loan was going to be submitted to its credit committee for approval during the week of August 16.

43. Given that the Receiver was serving in a fiduciary capacity, we did not believe it was prudent to decide how to proceed until obtaining all of the available information necessary to make a fully informed decision about the risk associated with a proposed sale of the business compared to the other options mentioned above.

44. Nevertheless, the Bank's attorney demanded that the Receiver execute the Stout brokerage agreement by 5:00 p.m. on Friday August 7, 2020. The Receiver did not believe that it was prudent to do so at that point given the fact that we were still waiting on the approval of the Crestmark loan, further offers related to the sale of the SFP real property, and the fact that UCS would be incurring an approximately $250,000.00 minimum liability by signing the Stout agreement.

45. On Monday August 10, 2020, the Receiver's counsel informed the Bank and the owners' counsel that the Receiver would wait until it had complete information before deciding on the best path forward for the Debtors. *See*, Exh. 2.

46. Notwithstanding the foregoing, the Bank's counsel emailed the Receiver's counsel at 2:09 p.m. on Friday August 14, 2020 and demanded the immediate shut down of the business and a forced liquidation of its assets. *See*, Exh. 3.

47. The Bank's counsel's letter suggested that the late Friday demand was a courtesy to the Receiver "to consider appropriate steps, particularly with regard to employees of the company." But the letter also said that the Bank objected to UCS's funds being "used to pay further employee salaries."

48. On Monday August 17, 2020, the Receiver's counsel informed the Bank's counsel by email and in attached correspondence that the Receiver would not shut down the business and that it would continue operating UCS as contemplated in the Receivership Order. *See*, Exh. 4. The Receiver again informed the Bank's counsel that it could only exercise its fiduciary duty by making an informed decision based on complete information.

49. The Bank's counsel has since scheduled a hearing in State Court in September 2020 on a motion seeking to compel the forced liquidation of UCS. The Bank's attorney also informed the Receiver that he plans to contact UCS's customers to demand that they pay the Bank notwithstanding the terms of the Receivership Order.

50. The Receiver does not believe that the forced liquidation of UCS is the best way to maximize the value of the business or its assets for the benefit of all stakeholders. Moreover, the Receiver does not believe that it is in the best interests of UCS and its stakeholders to allow the Bank's counsel to contact its customers. In fact, the undersigned views these actions as detrimental to the business and its stakeholders.

51. For the foregoing reasons, the Receiver determined that filing these chapter 11 cases was in the best interests of the Debtors and their stakeholders.[2]

## First Day Motions

52. Concurrently with the filing of the Debtors' chapter 11 cases, the Debtors are filing the First Day Motions requesting various forms of relief from the Court.

---

[2] As of the filing of these petitions, UCS received a final financing commitment from Crestmark in the amount of $2,627,040.

53. Generally, the purpose of the First Day Motions is to: (a) obtain authorization for cash collateral use and the continued use of the Debtors' bank accounts, (b) establish procedures for the smooth and efficient administration of these chapter 11 cases, and (c) to allow the Debtors to continue their businesses and financial affairs without significant interruption.

54. I have reviewed each of the First Day Motions, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization. The First Day Motions are specifically identified below in turn.

55. *Motion for Order Authorizing Joint Administration*. The Debtors filed a motion that seeks to have their bankruptcy cases jointly administered. Joint administration of the Debtors' cases is necessary for the administrative convenience of all parties in interest and is the only fair way to administer the cases for all creditors and stakeholders given the entanglement created by the inter-affiliate guarantees and cross-collateralization of various debts. This motion does not seek to substantively consolidate the Debtors at this point, although the undersigned reserves the right to do so in this case.

56. **Bank Account Motions**. Each of the Debtors filed an *Emergency Motion of the Debtor for Entry of Order (I) Authorizing Maintenance of Existing Bank Accounts and Cash Management System, (II) Authorizing Continued Use of Existing Business Forms, and (III) Granting Related Relief*. Each of these motions should be approved to allow the Debtors to continue operating without disruption, and to avoid creating undue burden, expense and administrative deadlock associated with transitioning their accounts and changing their existing business forms.

57. **Utilities Motion**. Debtor UCS filed a motion to, among other things, provide adequate assurance of post-petition payments to utility providers and to prevent them from terminating services. As set forth in the motion, UCS has sufficient funds on hand to pay its

utility providers who provide water, sewer, electrical, gas, telephone, internet, trash removal, and security services. I further submit that a one month security deposit totaling $16,680, as proposed in the motion, is reasonably sufficient to provide adequate assurance to these identified utility providers in exchange for UCS's continued use of these critical utility services.

58. **Payroll Motion**. Debtor UCS filed a *Motion of Debtor for Authority to Pay Prepetition Payroll, Payroll Taxes, Employee Benefits and Other Related Expenses* seeking Court approval for the Debtor to pay pre-petition wages, salaries, and other employee benefits. In pertinent part, the motion seeks approval for UCS to pay approximately $68,868.82 (including withholding) on August 28, 2020 to the company's 65 employees for the pay period starting on August 17, 2020 and ending on August 23, 2020.

59. The only insiders that are included in this payroll are Larry Schwartz, Jason Schwartz, Zach Schwartz and Adam Schwartz. They are all employed by the company and their salaries are reasonable in light of the work they perform for UCS. None of the insiders' levels of compensation as employees has increased significantly within the past several years, and the insider compensation was reduced by approximately 50% by the Receiver upon its appointment. Paying these pre-petition wages and honoring the other pre-petition benefits set forth in the motion are necessary to continue the efficient operation of the business to achieve a successful reorganization.

60. **Motion to Appoint Independent Manager**. The Debtors filed the *Ex Parte Application of the Debtors for Authority to Retain ABTVRS as Independent Manager*. In this motion, the Debtors seek the entry of an order appointing ABTVRS as the Independent Manager for each Debtor with the sole authority and exclusive powers to: (a) oversee and manage the day-to-day operations of the Debtors, and (b) take all actions necessary and proper on behalf of the Debtors to prosecute these chapter 11 cases. The undersigned submits that granting this motion is reasonable and necessary under the circumstances to achieve a successful reorganization in

this case because: (a) ABTVRS has served in this identical capacity for over eight months, (b) the financial performance of UCS has dramatically improved over that period of time under the management of ABTVRS, and (c) the likelihood of a significant disturbance to the business and operations of the Debtors associated with changing its pre-petition management structure immediately after filing their chapter 11 petitions.

61.  **Cash Collateral Motion**.  Debtor UCS filed an *Emergency Motion of the Debtor to Use Cash Collateral Pursuant to Sections 361 and 363 of the Bankruptcy Code* in which it seeks interim Court approval to use cash collateral to fund its operations and bankruptcy related expenses.  UCS seeks interim authority to pay the expenses on the formal budget attached to the motion and attached hereto (the "Budget").  *See*, Exh. 5.  The Budget covers the eight week period from the week ending 8/28 through the week ending 10/16.

62.  The Budget is a continuation of the 13 week Budget under which UCS has been operating the receivership, without objection from any party, for over five weeks with certain changes necessitated by the bankruptcy filings such as utility deposits.  Given UCS's approximately five week collection cycle (and the fact that July and August are historically slow months), the company forecasts that collections are expected to increase in the beginning of October 2020 as they have historically done as reflected on the cash receipts forecast portion of the Budget.  The undersigned submits that the expenses identified on the attached Budget are reasonable and necessary to continue operating the business and to pay for bankruptcy related expenses.

63.  Included in the Budget are payments to vendors that are critical to the continued operation of debtor UCS in the aggregate amount of $29,902.46. The contemplated payments are proposed to the following vendors in the following amounts: (a) Highland Foam ($6,372.56)(key vendor of specific foam supplies), (b) Star Extruded Shapes ($1,755.00)(manufactures custom aluminum extrusions for UCS), (c) Allied Caster ($1,361.20)(supplier of casters and essential to

quality improvements and price reduction for UCS), (d) Dero ($6,263.70)(creates custom injection molded products for UCS), and (e)Aegis ($14,150)(critical vendor for daily domestic truckload transportation). The proposed payments to Aegis, Highland Foam, and Star were all related to goods or service provided within twenty days of UCS's bankruptcy filing. The payments to Allied Caster and Dero are also critical to the continued operation of UCS, the quality of its products, and these vendors have extended credit to UCS as opposed to many vendors that have required UCS to purchase materials by paying cash on delivery.

64. ***Adequate Protection***. As set forth in the cash collateral motion, the continued operation of UCS as a going concern should provide adequate protection to the Bank. In addition, UCS requests that the Court grant the Bank with replacement liens in post-petition assets to the same validity, extent and priority as existed pre-petition, for all cash collateral actually expended.

65. Moreover, and even though UCS's cash balance on deposit decreases temporarily over the eight week period set out in the Budget given the typical seasonal decline, the Bank is also adequately protected by virtue of a substantial equity cushion with respect to its alleged collateral. As of the beginning of August 2020, the principal balance of the Operating Loans was $1,180,294.99 and the principal balance of the SFP Loan was $3,580,761.34 (a total of $4,761,056.33).

66. The Bank, however, has a substantial equity cushion in the event that its liens are properly perfected as set forth in the chart below:

| Bank's Claimed Collateral | Value | Source |
|---|---|---|
| Accounts receivable | $955,313 | UCS's books and records as of August 21, 2020 |
| Cash | $1,086,548 | UCS's books and records as of |

| | | August 21, 2020 |
|---|---|---|
| Machinery and Equipment | $2,149,200 | Bank's fair market value appraisal as of April 27, 2020 |
| Inventory | $538,288 | UCS's balance sheet as of 6/30/2020 |
| Real estate/SFP plant | $4,700,000 | MAI appraisal of value as of 3/19/2018 performed for the Bank[3] |

## Conclusion

67. For all the reasons set forth herein and in the First Day Motions, I respectfully request that the Court grant the relief requested in each of the First Day Motions.

I certify under penalty of perjury, this 25th day of August, 2020, that the foregoing is true.

            */s/ John Fioretti*
            John Fioretti

---

[3] The Receiver requested a copy of the Bank's updated appraisal multiple times in the last two months. The Bank has refused to provide a copy of the updated appraisal to the Receiver. SFP also has a written letter of intent to purchase the property for $3,650,000.00.